Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Charles P. Kocoras | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 9479 | **DATE** | 6/26/2002 |
| **CASE TITLE** | Cook Incorporated vs. Boston Scientific Corp. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] **ENTER MEMORANDUM OPINION:** We grant Boston's cross-motion for summary judgment and deny Cook's cross-motion for summary judgment.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | Document Number |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | JUN 2 6 2002 | |
| ✓ | Docketing to mail notices. | | date docketed | |
| | Mail AO 450 form. | | | 77 |
| | Copy to judge/magistrate judge. | | docketing deputy initials | |
| SCT | courtroom deputy's initials | 02 JUN 26 PM 2:29 | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

COOK INCORPORATED, )
)
Plaintiff, )
)
vs. ) 01 C 9479
)
BOSTON SCIENTIFIC CORPORATION, )
)
Defendant. )

## MEMORANDUM OPINION

CHARLES P. KOCORAS, District Judge:

This matter comes before the court on the parties' cross-motions for summary judgment. For the reasons set forth below, the motion of Plaintiff Cook, Inc. ("Cook") is denied and the motion of Defendant Boston Scientific Corporation ("Boston") is granted.

## BACKGROUND

In 1997, a Canadian corporation called Angiotech entered into an exclusive licensing agreement ("the Angiotech Agreement") with Cook and Boston. The subject of the license was certain patent rights to an invention that allows expandable metal tubes called stents to be coated with medication to increase their treatment effectiveness. The agreement granted worldwide coexclusive rights to Cook and Boston to "use, manufacture, have manufactured, distribute and sell, and to grant sublicenses

77

to its Affiliates to use, manufacture, have manufactured, distribute and sell, the Angiotech Technology...for use in the Licensed Applications." Licensed Applications include stent products and endoluminal delivery devices, such as stent grafts and balloons, that incorporate the Angiotech Technology. Each licensee is responsible for obtaining necessary regulatory approval for the Licensed Applications they produce. In addition, none of the parties could assign their rights or obligations under the agreement without the prior written consent of the other two.

In a series of contracts, all entered into on August 16, 2001, Cook executed five agreements with Advanced Cardiovascular Systems, Inc. ("ACS"): a Paclitaxel Coated Stent ("PCS") Distribution Agreement, a Component Supply Agreement, a PCS Development Agreement, a Stent Delivery System Distribution Agreement, and a Cross-License Agreement. The PCS Distribution Agreement focuses on a commercial relationship wherein ACS acts as the exclusive distributor for coronary paclitaxel-coated stents manufactured by Cook. The Component Supply Agreement covers the supply of certain components of the Cook coronary stents by ACS. The PCS Development Agreement details the process through which the parties will collaborate to test, conduct clinical trials, and obtain appropriate regulatory approval for the products to be made and distributed under the previous two agreements. The Stent Delivery System Distribution Agreement describes an arrangement wherein Cook will act as a nonexclusive distributor for stent delivery systems manufactured by ACS. Finally, the Cross License Agreement grants license rights to Cook and ACS in certain

enumerated patents that the other party holds. Each agreement purports to be an integrated whole, independent of the others. Upon learning of Cook's arrangement with ACS, Boston sent a letter to Cook and issued a press release, indicating its belief that the Cook-ACS association was in violation of the Angiotech Agreement.

Cook filed suit, seeking a declaratory judgment that they are not in breach of the Angiotech Agreement, as well as asserting violations of both the Sherman Act and the Lanham Act based on the notice letter and the press release. Boston answered the complaint and asserted two counterclaims, one for breach of contract and one for breach of the implied covenant of good faith and fair dealing. Certain counts of the complaint and counterclaim were dismissed on February 28, 2002. The parties have now filed cross-motions for summary judgment on the breach of contract claims.[1]

## LEGAL STANDARD

Summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). In seeking a grant of summary judgment the moving party must identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of

---

[1] One additional event in the procedural history of this case deserves mention. In the process of discovery for the instant motions, Cook turned over privileged documents to Boston. The ensuing motion to have the documents returned was denied, but none of the contents of those documents had any effect on this decision.

material fact ." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed.R.Civ.P. 56(c)). This initial burden may be satisfied by presenting specific evidence on a particular issue or by pointing out "an absence of evidence to support the non-moving party's case." Celotex, 477 U.S. at 325. Once the movant has met this burden, the non-moving party cannot simply rest on the allegations in the pleadings, but "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). A "genuine issue" in the context of a motion for summary judgment is not simply a "metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); rather, "[a] genuine issue exists when the evidence is such that a reasonable jury could find for the non-movant," Buscaglia v. United States, 25 F.3d 530, 534 (7th Cir. 1994). When reviewing the record we must draw all reasonable inferences in favor of the non-movant; however, "we are not required to draw every conceivable inference from the record–only those inferences that are reasonable." Bank Leumi Le-Israel, B.M. v. Lee, 928 F.2d 232, 236 (7th Cir. 1991).

When parties file cross motions for summary judgment, each motion must be assessed independently, and denial of one does not necessitate the grant of the other. Heder v. City of Two Rivers, 149 F. Supp. 2d 677, 683 (E.D. Wis. 2001). Rather, each motion evidences only that the movant believes it is entitled to judgment as a matter of law on the issues within its motion and that trial is the appropriate course of action if the court disagrees with that assessment. Miller v. LeSea Broadcasting, Inc., 87 F.3d 224, 230 (7th Cir. 1996). With these principles in mind, we turn to the parties' motions.

## DISCUSSION

Although the complaint in this case includes counts that are not based on breach of contract, the motions at issue both center on whether the Angiotech Agreement allowed Cook to enter into the ACS Agreements. Boston argues that the latter Agreements constitute an assignment of Cook's rights to distribute and sell the Licensed Applications as well as an improper delegation of Cook's responsibility for obtaining regulatory approval. Cook insists that its arrangement with ACS is a valid and permissible exercise of its licensing rights and claims that Boston has no standing to bring any claim against Cook arising out of the terms of the Angiotech Agreement. Because Boston cannot bring any action without standing to do so, we examine that issue at the outset.

**Boston's Standing**

To have standing to sue, a party must show three things: (1) injury in fact; (2) a causal connection between the injury and the actions of the defendant; and (3) a likelihood that a favorable decision will redress the injury. Lujan v. Defenders of Wildlife, 112 S. Ct. 2130, 2136 (1992). Boston clearly has standing to proceed in an action predicated on a contract to which it was a party. Bort v. Parker, 42 P.3d 980, 987 (Wash. App. Ct. 2002). Cook's rights under the Angiotech Agreement are subject to the rights granted to Boston. Angiotech Agreement, ¶ 2.1. Additionally, Cook and Boston are in contractual privity to an agreement that, among other things, requires permission of each of them and Angiotech before the transfer of any of its rights under

the contract. Id., ¶ 11.7. Any breach by Cook would therefore directly impact Boston's rights under the Angiotech Agreement. Boston also satisfies the second and third elements: the actions that would cause the injury to Boston's rights of exclusivity are directly traceable to Cook's action in entering into the ACS Agreements, and a decision in favor of Boston that Cook's actions are impermissible under the Angiotech Agreement will prevent any encroachment on Boston's exclusive rights to engage in the licensed activities, thereby redressing Boston's injury. Thus, Boston has standing to pursue its action that Cook has breached the Angiotech Agreement and in so doing, has violated Boston's coexclusive license rights. We turn to an examination of the respective agreements.

**The Angiotech and ACS Agreements**

The Angiotech Agreement licenses patented paclitaxel technology to Cook and Boston. Disputes surrounding patent licenses are not run-of-the-mill contract cases; these agreements have unique attributes that set them apart from other contractual arrangements. At the time a patent is issued, the patent holder has all the rights to the patent that are granted by statute. 35 U.S.C. § 100 et seq. Through the license, the patent holder (the licensor) grants certain rights to another party (the licensee), which amount to an agreement not to sue the licensee for the activities described within the license. Munters Corp. v. Burgess Indus., Inc., 194 U.S.P.Q. 146, 153 (S.D.N.Y. 1977). Without the license, the activities in which the licensee engages would constitute patent infringement. Public Varieties of Mississippi, Inc. v. Sun Valley Seed Co., 14

U.S.P.Q.2d 2055, 2057 (N.D. Miss. 1990). Because of the nature of patent rights and licenses, a patent license is personal to the licensee and allows only the activities enumerated within the license to the exclusion of any activity not specified. PPG Industries, Inc. v. Guardian Industries Corp., 597 F.2d 1090, 1093 (6th Cir. 1979). In other words, silence as to a particular activity implicitly prohibits the licensee from engaging in that activity. See, e.g., Unarco Industries, Inc. v. Kelley Co., 465 F.2d 1303, 1306 (7th Cir. 1972) (assignability); Ozyagcilar v. Davis, 221 U.S.P.Q. 1064, 1070 (D.S.C. 1983) (divisibility and sublicensing). Any right not specifically granted by the licensor remains with the licensor, and the rights granted in the license cannot expand beyond the boundaries delineated in the agreement.

Unlike the majority of cases that call for construction of a patent license, this case does not involve a claim of infringement brought by a licensor. Angiotech is not a party to this action, alleging that ACS's activities infringing its patent rights; the litigation involves only the two licensees fighting over whether Cook has breached the license. However, the underlying rules must still apply even if a party other than the patent holder seeks relief; the extent of the license rights cannot change based on who is bringing suit.

Initially, Cook casts its relationship with ACS as permissible under the license because Cook is the sole party practicing the patented invention. Cook argues that the license encompasses only the technology and know-how associated with making paclitaxel and coating stents with it; in other words, it involves only the Angiotech

Technology.[2] Because ACS does not have access to the Angiotech Technology, Cook insists that there is no violation of the license. This view of the license's coverage is entirely too narrow. It disregards the fact that the language of the Angiotech Agreement explicitly provides not only that Cook and Boston will be the only parties practicing the Angiotech Technology but also that they are the sole parties who can make, have made, use, distribute, or sell Licensed Applications. Involved here are the distribution and sale of products that qualify as Licensed Applications, activities clearly within the ambit of the license in the Angiotech Agreement. Cook's contention that it cannot be in breach of the Angiotech Agreement because ACS is not the party who applies the paclitaxel is therefore without merit.

In arguing their respective positions on breach of the Angiotech Agreement, both parties attest that the Angiotech Agreement is unambiguous, but each offers a different interpretation of its language. Cook insists that the Angiotech Agreement grants it an unrestricted right to sell the Licensed Applications to whomever it pleases and an unrestricted right to distribute those Applications to parties who are not ultimate users of the product but who intend to distribute the product via resale. Boston, on the other hand, disputes that Cook's rights are unrestricted, claiming instead that they are subject to Boston's coextensive rights under the license. Boston also points out that Cook's

---

[2]This argument rings somewhat hollow in light of ¶ 2.2 of the Component Supply Agreement, which states that six months after the effective date of the ACS Agreements, Cook shall consider providing ACS with the knowledge necessary for ACS to itself coat the stent products, i.e., to allow ACS to practice the Angiotech Technology.

distribution activities are restricted by the lack of a textual grant of a right to have the Licensed Applications distributed.

At the outset, we note that the overall structure of the Angiotech Agreement clearly evinces an intent that only Cook and Boston are to be players in the paclitaxel business. The license Angiotech granted is exclusive to Cook and Boston, meaning that Angiotech cannot later license the same rights to other parties. Angiotech Agreement, ¶ 2.1. In addition, the plain language of the Angiotech Agreement states that the rights granted to Cook and Boston are to be coextensive and the exercise thereof is subject to the rights of the other. Id. There is no room in this set-up for another party to be introduced, except with unanimous consent of all parties. Id., ¶ 11.7. Despite this overwhelming tenor of exclusivity, Cook now insists that it can add ACS to the mix pursuant to its rights to sell or distribute Licensed Applications.

*The Right to Sell*

Cook first relies on its right to sell, arguing that the transaction with ACS includes a sale of the Licensed Applications to ACS. According to Cook, any activity ACS engages in after the purported sale is outside the reach of the patent and consequently the license rights by operation of the patent exhaustion doctrine, which provides that a patent holder's rights (and thus a licensee's) are protected only up until the product is first sold by an authorized party. See ULSI, 995 F.2d at 1568. Sales subsequent to the first sale do not implicate the patent or license rights. Id. In other words, a license to sell is really a license to make a first sale. In support of the propriety

of the ACS Agreements, Cook asserts that its arrangement with ACS is nothing more than a sale to a third party, who will later resell the product to other purchasers. Because the license allows Cook to sell the Licensed Applications incorporating the Angiotech Technology, Cook claims that the patent exhaustion doctrine operates to place any subsequent sale by ACS outside the reach of the license, making ACS free to dispose of the products as it pleases without running afoul of the license rights.. See, e.g., Intel Corp. v. ULSI Sys. Tech., Inc., 995 F.2d 1566, 1568 (Fed. Cir. 1993); Lisle Corp. v. Edwards, 777 F.2d 693, 695 (Fed. Cir. 1985).

Boston avers that the ACS deal is not an actual sale but rather is akin to the "pass-through" arrangement found to be an impermissible de facto sublicense in E.I. du Pont de Nemours & Co. v. Shell Oil Co., 498 A.2d 1108 (Del. 1985). In du Pont, du Pont licensed certain technology to Shell Oil Company ("Shell") that allowed Shell to "make, have made, use and sell for use and resale" an insecticide called methomyl. A third party, Union Carbide Agricultural Corporation ("Carbide"), also sought a license for methomyl from du Pont, but du Pont chose not to grant a license to Carbide. Carbide then struck a deal with Shell whereby Carbide would place an order with Shell for the methomyl it required. Carbide would then manufacture the methomyl it had ordered from Shell under Shell's rights to have the methomyl made. As soon as the methomyl was produced, Carbide simultaneously bought it from Shell under Shell's right to sell the compound for use. The process was documented in two separate agreements, one covering the "have made" aspect and one detailing the "sale" of the

finished methomyl to Carbide. The trial court initially determined that the arrangement was a valid exercise of Shell's rights under the du Pont license, but the Delaware Supreme Court disagreed, concluding that the combined exercise of "have made" and "sell" rights with the same third party acting as both manufacturer and ultimate purchaser amounted to a sublicense, specifically prohibited by the license terms.

Despite Cook's protestations to the contrary and language included within the ACS agreements, it is clear that the five agreements are not separate, independent contracts but five pieces of one whole.[3] The law of contract interpretation requires, then, that the contract must be considered as an integrated whole and its specific enumerations of rights and obligations be read in a harmonious and complementary manner. Boyd v. Davis, 897 P.2d 1239, 1241 (Wash. 1995). Cook saw fit to enter into at least five separate contracts with the same party on the same day, with substantial overlap, which in some aspects expands to complete duplication of subject matter. To act in this way is, at the least, intriguing and, at the most, a transparent attempt to draft around the limitations clearly expressed within the Angiotech Agreement.

Although the pass-through nature of the ACS deal is more skillfully hidden than was the case in du Pont, the arrangement is no less of a sham. The ACS Agreements assign Cook's right to make the first authorized sale of the Licensed Applications to ACS in direct contravention of the Angiotech Agreement. These five agreements, like

---

[3]For example, both the Component Supply and Paclitaxel Distribution Agreements nonsensically purport to be the entire agreement of the parties with respect to the distribution and supply of Cook coronary paclitaxel coated stent systems.

- 11 -

the two contracts in <u>du Pont</u>, combine into an attempt to circumvent the restrictions of the original license from Angiotech. To find them unoffending to the Angiotech Agreement would enable Cook to do unilaterally what the three original parties agreed could only be done with the consent of all parties to the Angiotech Agreement: a grant to another entity of rights given solely to Boston and Cook.

Like the two agreements in <u>du Pont</u>, the Component Supply and Paclitaxel Distribution Agreements are two sides of the same coin, split up to create the illusion of an exercise of license rights. Cook and ACS deliberately divided this stage of the ACHIEVE production process to make it appear that the first sale of the finished product is to ACS, but when the two agreements are read together, it is evident that Cook and ACS are joint participants in the process of generating the final ACHIEVE stent product, and the first authorized sale of that product, which is a Licensed Application under the Angiotech Agreement, is done by ACS, not Cook. The arrangement embodied in the two agreements therefore represents an impermissible assignment of Cook's right to make the first sale of the Licensed Application.

*The Right to Distribute*

As an alternative ground, Cook contends that its right to distribute Licensed Applications allowed the type of arrangement it entered with ACS; it argues that the fact that ACS will also distribute the Licensed Application is immaterial.

If the Angiotech Agreement included only the right to sell, without separate mention of the right to distribute, Cook would stand on firmer ground. Where a license

agreement mentions only a right to sell, exclusive distributor arrangements can be permissible. See Unidisco, Inc. v. Schattner, 824 F.2d 965, 968 (Fed. Cir. 1987); Lisle, 777 F.2d at 694-95. But the Angiotech Agreement specifically separates the right to distribute from the right to sell. This language evinces a clear intent that distributing, or selling for the purpose of resale, was not included in the companion right to sell. The structure of the Angiotech Agreement thus indicates that the right to distribute the Licensed Applications is not congruent with the right to sell, but the parties did not define what activities the term "distribute" includes. In the absence of an explicit definition, we must assume that the parties intended the word to maintain its ordinary meaning. Blue Mountain Memorial Gardens v. Washington, 971 P.2d 75, 77 (Wash. App. Ct. 1999). To distribute is to act as a wholesaler or other "merchant middleman" who is authorized by a manufacturer or supplier to sell chiefly to retailers and commercial users. Black's Law Dictionary 475-76 (6th ed. 1990). As stated, the ability of a patent licensee to sell a licensed product to a distributor, who then resells the product, is carried out under "sale" rights of licenses. See Unidisco, 824 F.2d at 968; Lisle, 777 F.2d at 694-95. The licensee exercises its right to sell the licensed product in making the first sale to the distributor, and the distributor then resells the product to other parties. But for the patent exhaustion doctrine, the distributor's resale would be an impermissible activity barred by the license. As we have noted, the Angiotech Agreement does not use a blanket grant of a right to sell the Licensed Applications, as was the case in Unidisco and Lisle; instead, the license specifically uses the separate

- 13 -

terms "sell" and "distribute." The only way to keep these terms from being redundant is to construe the agreement as providing that only licensed parties can act as "merchant middlemen" between manufacturer and retailers or commercial users of the finished product. Otherwise, there would be no need to include the separate term "distribute."

Cook disputes that du Pont should control in this case, relying instead on a line of cases that deal with so-called foundry arrangements, in which a licensed party manufactures a patented product for a nonlicensed party. Cyrix Corp. v. Intel Corp., 77 F.3d 1381 (Fed. Cir. 1996), ULSI, 995 F.2d 1566 , Intel Corp. v. U.S. Int'l Trade Comm'n, 946 F.2d 821 (Fed. Cir. 1991). These cases are inapposite for one very important reason. In each case where a foundry arrangement was upheld, the licensee was exercising a right specifically granted within the respective licenses: the right to have the licensed product made. Here, Cook in essence argues that it is using ACS as its distribution foundry, but the Angiotech Agreement does not allow Cook to have the Licensed Applications distributed for it by a third party.

The terms of the Angiotech Agreement therefore show that the parties intended to preclude any nonlicensed party from distributing the Licensed Applications.[4] The

---

[4]This conclusion is buttressed by the overall structure of the agreement, discussed above, which restricts Angiotech from licensing the rights granted to Cook and Boston to any other party and makes each licensee's rights subject to those of the other licensee. See Tanner Electric Coop. v. Puget Sound Power & Light Co., 911 P.2d 1301, 1310 (Wash. 1996) (stating that individual contractual provisions must be analyzed in light of their context within the entire agreement). This indicates that the signatories contemplated that only these three parties would engage in the activities described in the agreement.

terms of the licensing agreement allow Cook to exercise its distribution rights only through itself or its affiliates. The agreement with ACS purports to allow ACS to distribute the licensed applications, i.e., to serve as a middleman between the manufacturer, Cook, and the ultimate user of the Licensed Applications. However, Angiotech, the patent holder, gave the right to engage in that activity only to Cook and Boston. For ACS to step into Cook's shoes and distribute the licensed applications therefore does not involve an exercise of Cook's rights under the license; rather it would necessitate a grant of those rights to ACS, which could only take the form of a prohibited assignment.

There is no mention within the Angiotech Agreement of a right to have the licensed products distributed by a third party. Silence of a license with respect to a specific activity is construed as an implied prohibition with respect to that activity. In addition, not only is there no express provision authorizing Cook to distribute through a third party, its contractual relationship with ACS would negate Boston's co-exclusive right to distribute the Licensed Applications. Additionally, viewing the grants of rights given by Cook to ACS collectively, its conduct would make a mockery of the exclusivity of the rights only it and Boston were endowed with by Angiotech. What Cook has attempted to do here is to grant a de facto sublicense to ACS or assign to it substantial rights it enjoys under the Angiotech Agreement. These attempts are neither authorized, permitted, nor lawful. Cook's attempts to separate various functions between it and ACS, and create a separate contract for each in an attempt to isolate

steps forming part of an integrated whole, are nothing more than a sham. As such, its actions cannot be countenanced.

*Regulatory Approval*

Finally, we turn to the issue of whether Cook has delegated its responsibility for obtaining regulatory approval for the Licensed Applications to ACS. Unlike the preceding two questions, this answer is very straightforward. Under the PCS Development Agreement, ACS is to obtain regulatory approval for investigational products. PCS Development Agreement, ¶ 3.3. ACS prepares an investigational plan for the clinical trials of the coronary stent systems and assumes all responsibility associated with that plan. Id., ¶¶ 5.2, 5.3. Cook attends no meetings with regulatory bodies unless ACS requests that it do so. Id., ¶ 5.3. ACS sponsors the studies and supplies its name as applicant. ACS is to obtain all necessary approvals and acts as the holder of all regulatory approvals obtained. Lastly, the choice whether to submit an application for premarket approval is solely within ACS's discretion. Cook's statement that it remains ultimately responsible for obtaining regulatory approval is blatantly contradicted by the language of the Development Agreement. Its involvement in the process is minimal, and the control and unfettered discretion of ACS is immediately apparent from the language of this agreement. In the face of the plain wording of the PCS Development Agreement, we conclude that Cook unlawfully assigned to ACS its responsibility to obtain regulatory approval for the Licensed Applications.

Because we conclude that Cook's arrangement with ACS exceeded the scope of its rights under the Angiotech Agreement, Boston is entitled to summary judgment that Cook has violated Boston's rights under the Angiotech Agreement. Cook's cross-motion to the contrary is correspondingly denied.

## CONCLUSION

Based on the foregoing analysis, we grant Boston's cross-motion for summary judgment and deny Cook's cross-motion for summary judgment.

_____
Charles P. Kocoras
United States District Judge

Dated:  June 26, 2002