### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| COOK INCORPORATED, | ) |
| | ) No. 01 C 9479 |
| Plaintiff, | ) |
| | ) Judge Charles P. Kocoras |
| v. | ) |
| | ) Magistrate Judge Nan R. Nolan |
| BOSTON SCIENTIFIC CORPORATION, | ) |
| | ) |
| Defendant. | ) |

**DOCKETED**
AUG 1 5 2002

**FILED**
AUG 1 4 2002

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

### NOTICE OF FILING

TO: Edward Han      Michael P. Padden
     Matthew M. Wolf      Michael K. Lindsey
     HOWREY SIMON ARNOLD & WHITE      HOWREY SIMON ARNOLD & WHITE
     1299 Pennsylvania Avenue, N.W.      321 North Clark Street, Suite 800
     Washington, DC 20004      Chicago, Illinois 60610

PLEASE TAKE NOTICE that on Wednesday, August 14, 2002 we filed with the Clerk

of the United States District Court for the Northern District of Illinois, Eastern Division, Cook's

Memorandum in Opposition to BSC's Motion for Injunctive Relief, a copy of which is attached

hereto and is herewith served upon you.

Dated: August 14, 2002

Ronald Wilder
Frederick J. Sperling
John A. Bannon

SCHIFF HARDIN & WAITE
6600 Sears Tower
Chicago, Illinois 60606
(312) 258-5500

Counsel for Plaintiff Cook Incorporated



**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| COOK INCORPORATED, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action No. 01-CV-9479 |
| v. | ) |
| | ) Judge Charles P. Kocoras |
| BOSTON SCIENTIFIC CORPORATION, | ) |
| | ) Magistrate Judge Nan R. Nolan |
| Defendant. | ) |

DOCKETED
AUG 1 5 2002

**COOK'S MEMORANDUM IN OPPOSITION**
**TO BSC'S MOTION FOR INJUNCTIVE RELIEF**

FILED

AUG 1 4 2002

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

Dated: August 14, 2002

Ronald Wilder
Frederick J. Sperling
John A. Bannon

SCHIFF HARDIN & WAITE
6600 Sears Tower
Chicago, Illinois 60606
312/258-5500

Attorneys for Plaintiff Cook Incorporated

89

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................ ii

INTRODUCTION ...................................................................................................... 1

ARGUMENT ............................................................................................................. 2

I.     BSC IS NOT ENTITLED TO AN INJUNCTION PROHIBITING COOK FROM
CONTINUING THE ONGOING ACHIEVE CLINICAL TRIAL AND USING
THE RESULTING DATA ...................................................................................... 3

    A.     There Is A Strong Public Interest In Allowing Clinical Trials To Continue
And The Resulting Data To Be Used ....................................................... 3

    B.     Federal Law Protects The Collection And Use Of Clinical Data For
Medical Devices Even Where Constitutionally-Based Claims Of
Exclusivity Are Asserted .......................................................................... 5

    C.     Barring Cook From Using The Clinical Data Would Punish Cook And
Award BSC A Windfall ............................................................................. 6

    D.     Enjoining The Collection And Use Of The Clinical Data Will Harm Cook
Substantially More Than Denial Will Harm BSC .................................... 7

II.     BSC IS NOT ENTITLED TO AN INJUNCTION PROHIBITING FUTURE
BUSINESS RELATIONSHIPS WITH ACS ......................................................... 8

III.     BSC IS NOT ENTITLED TO AN INJUNCTION PROHIBITING
PERFORMANCE UNDER THE GUIDANT AGREEMENTS ............................. 9

    A.     Cook Will Be Irreparably Harmed If An Injunction Is Issued Now ........ 9

    B.     BSC Is Not Being Damaged ..................................................................... 10

    C.     If The ACHIEVE Stent Is Commercially Sold In The Future, BSC Has An
Adequate Legal Remedy And Will Not Be Irreparably Harmed ............. 12

CONCLUSION ........................................................................................................... 14

# TABLE OF AUTHORITIES

Page

## Cases

AbTox, Inc. v. Exitron Corp.,
   122 F.3d 1019 (Fed. Cir. 1997) .................................................................................................... 5

Agronic Corp. of America v. deBough,
   585 P.2d 821 (Wash. Ct. App. 1978) ....................................................................................... 2, 7

Bell Fuels, Inc. v. Butkovich,
   559 N.E.2d 164 (Ill. App. Ct. 1990) .......................................................................................... 11

Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc.,
   No. 95 Civ. 8833, 2001 U.S. Dist. LEXIS 19361 (S.D.N.Y. Nov. 27, 2001) ........................... 5

Cedar-Al Prods., Inc. v. Chamberlain,
   748 P.2d 235 (Wash. Ct. App. 1987) ........................................................................................ 10

Datascope Corp. v. Kontron Inc.,
   786 F.2d 398 (Fed. Cir. 1986) .................................................................................................. 14

Decker v. Schulze,
   39 P. 261 (Wash. 1895) ......................................................................................................... 3, 12

Doe v. Bridgeport Police Dep't,
   198 F.R.D. 325 (D. Conn. 2001) .............................................................................................. 13

DSC Communications Corp. v. Next Level Communications,
   107 F.3d 322 (5th Cir. 1997) .................................................................................................... 13

Eli Lilly & Co. v. Medtronic, Inc.,
   496 U.S. 661 (1990) .................................................................................................................... 5

Eli Lilly & Co. v. Medtronic, Inc.,
   915 F.2d 670 (Fed. Cir. 1990) .................................................................................................... 5

Guaranty Trust Co. of New York v. York,
   326 U.S. 99 (1945) ...................................................................................................................... 2

Hanger Prosthetics & Orthotics, Inc. v. Morgan,
   No. Civ. A. 00-0170-CB-S, 2000 WL 1843820 (S.D. Ala. Oct. 17, 2000) ................................ 2

John Hopkins Univ. v. CellPro, Inc.,
   152 F.3d 1342 (Fed. Cir. 1998) .................................................................................................. 5

Kitsap County v. Kev, Inc.,
   720 P.2d 818 (Wash. 1986) .................................................................................................... 8, 9

Kucera v. Department of Transp.,
   995 P.2d 63 (Wash. 2000) .......................................................................................................... 2

Lewis Pac. Dairymen's Ass'n v. Turner,
   314 P.2d 625 (Wash. 1957) ........................................................................................................ 9

Malyon v. Pierce County,
   935 P.2d 1272 (Wash. 1997) ................................................................ 2

NeoRX Corp. v. Immunomedics, Inc.,
   877 F. Supp. 202 (D.N.J. 1994) ............................................................ 5

Northwest Television Club, Inc. v. Gross Seattle, Inc.,
   634 P.2d 837 (Wash. 1981) ................................................................ 6

Petereit v. S.B. Thomas, Inc.,
   63 F.3d 1169 (2d Cir. 1995) ............................................................ 13

Pfizer, Inc. v. International Rectifier Corp.,
   217 U.S.P.Q. 157 (C.D. Cal. 1982) ...................................................... 5

Programmed Tax Sys., Inc. v. Raytheon Co.,
   419 F. Supp. 1251 (S.D.N.Y. 1976) ...................................................... 9

Rathke v. Roberts,
   207 P.2d 716 (Wash. 1949) ................................................................ 6

Roche Prods., Inc. v. Bolar Pharm. Co.,
   733 F.2d 858 (Fed. Cir. 1984) .......................................................... 13

Salsbury Labs., Inc. v. Merieux Labs., Inc.,
   735 F. Supp. 1537 (M.D. Ga. 1987) ................................................ 11, 13

Sampson v. Murray,
   415 U.S. 61 (1974) ...................................................................... 13

Scheiber v. Dolby Labs. Inc.,
   293 F.3d 1014 (7th Cir. 2002) ........................................................... 6

System Operations, Inc. v. Scientific Games Dev. Corp.,
   555 F.2d 1131 (3d Cir. 1977) ............................................................ 2

Telectronics Pacing Sys., Inc. v. Ventritex, Inc.,
   982 F.2d 1520 (Fed. Cir. 1992) .......................................................... 5

Ty, Inc. v. Publications Int'l Ltd.,
   292 F.3d 512 (7th Cir. 2002) ........................................................... 10

Tyler Pipe Indus., Inc. v. Department of Revenue,
   638 P.2d 1213 (Wash. 1982) ................................................................ 2

Walgreen Co. v. Sara Creek Property Co.,
   966 F.2d 273 (7th Cir. 1992) ........................................................... 14

Whatcom County v. Kane,
   640 P.2d 1075 (Wash. Ct. App. 1981) .................................................... 8

## **Statutes**

35 U.S.C. § 271(e)(1) ......................................................................................................... 5, 6, 13

35 U.S.C. § 271(c)(3) ............................................................................................................. 5

## **Other Authorities**

3 E. Allen Farnsworth, <u>Farnsworth on Contracts</u>
    § 12.8 (2d cd. 1998) ........................................................................................................ 6

## INTRODUCTION

Although BSC has an adequate remedy at law, it seeks to stop medical research and the use of medical technology that physicians think may be the next significant advance in the treatment of coronary artery disease (the leading cause of death in the U.S.). If the Court grants BSC's requested injunctive relief, it will cause irreparable harm to the public interest and to Cook. Even if Cook prevails on appeal, it would have no ability to recover from the harm caused by the injunction. BSC, on the other hand, has an adequate damages remedy if Cook does not prevail on appeal. The public interest and the balance of harms weigh strongly against the issuance of any injunction. In addition, BSC's arguments are premised on the erroneous assumption that the "legality" of the Guidant Agreements has been finally resolved.[1] However, this will not be finally determined until after Cook's appeal in this case is completed.

Specifically, BSC's request for an injunction should be denied for the following reasons:

- There is a strong public interest in allowing the clinical trial of Cook's ACHIEVE stent to continue and the resulting data to be used.

- Public policy, Congress, and case law do not support granting an injunction prohibiting the collection and use of data to obtain FDA approval of a medical device.

- An injunction would permanently and irreparably harm Cook and award BSC a windfall.

- BSC will not suffer irreparable harm if no injunction issues.

- Enjoining the use of clinical data "in connection with" the ACHIEVE stent would put Cook in a worse position than it would have been but for the breach.

- BSC's alleged damages are speculative at this time and, if BSC prevails on appeal, monetary damages will provide it with an adequate remedy at law.

- BSC's proposed injunction is substantially overbroad and would restrain otherwise lawful activity.

---

[1] The "Guidant Agreements" refer to the three agreements that define the existing Cook/ACS relationship. Guidant is the parent company of ACS. These agreements are the Paclitaxel-Coated Stent Distribution Agreement, the Component Supply Agreement, and the Paclitaxel-Coated Stent Development Agreement. The remaining two agreements entered into on August 16, 2001 (i.e., the Cross License Agreement and the Stent Delivery System Distribution Agreement) do not relate to the Angiotech Technology or the ACHIEVE stent.

So that the Court may fully consider the impact of BSC's requested injunction, Cook offers the declarations of the following experts: (1) Dr. Campbell Rogers, a leading cardiologist intimately familiar with the three major efforts to introduce a drug-eluting stent in the U.S., (2) Robert Sheridan, a former FDA director responsible for reviewing and approving clinical work, (3) Dr. Sigmund Weitzman, the current medical director of Northwestern University's hospital ethics review board, and (4) Dr. Richard Rapp, Ph.D., a leading economics expert. Cook also submits the affidavit of Phyllis McCullough, Cook's Chairman of the Board. Cook renews its request for a brief evidentiary hearing.

## ARGUMENT

Washington law applies in determining whether a permanent injunction should issue in this case.[2] A party seeking a permanent injunction bears the burden of showing "(1) that he has a clear legal or equitable right, (2) that he has a well-grounded fear of immediate invasion of that right, and (3) that the acts complained of either are resulting in or will result in actual and substantial injury to him." Malyon v. Pierce County, 935 P.2d 1272, 1289 (Wash. 1997) (en banc). The moving party must show that it has no adequate legal remedy at law and that it would be irreparably injured absent an injunction. See Kucera v. Department of Transp., 995 P.2d 63, 68 (Wash. 2000) (en banc) ("[I]njunctive relief will not be granted where there is a plain, complete, speedy and adequate remedy at law."); Agronic Corp. of Am. v. deBough, 585 P.2d 821, 824 (Wash. Ct. App. 1978) ("The essential elements which must be shown before an injunction will be granted are necessity and irreparable injury."). A court also must consider the balance of harms to the parties and the interests of the public. See Tyler Pipe Indus., Inc. v. Department of Revenue, 638 P.2d 1213, 1217 (Wash. 1982) (en banc) ("[S]ince injunctions are addressed to the equitable powers of the court, the listed criteria must be examined in light of equity including balancing the relative interests of the parties and, if appropriate, the interests of

---

[2] Having argued for the application of Washington law, BSC now ignores it. Washington law governs the issuance of a permanent injunction because a federal court will apply state substantive law in diversity cases, and a permanent injunction is substantive. See Guaranty Trust Co. of New York v. York, 326 U.S. 99, 110-12 (1945) (applying state statute of limitations that would deny recovery in diversity case); System Operations, Inc. v. Scientific Games Dev. Corp., 555 F.2d 1131, 1143 (3d Cir. 1977) ("New Jersey law defines all the rights and liabilities of the parties including . . . the prayer for permanent injunctive relief."); Hanger Prosthetics & Orthotics, Inc. v. Morgan, No. Civ. A. 00-0170-CB-S, 2000 WL 1843820, at *1 (S.D. Ala. Oct. 17, 2000) ("In a diversity case, whether to grant a permanent injunction is governed by state law.").

the public."). Finally, in contract cases, money damages, not injunctions, are the norm. See, e.g., Decker v. Schulze, 39 P. 261, 263 (Wash. 1895) ("It is fundamental that equity will not interfere where the law affords a plain, adequate, and complete remedy. . . . For a breach of contract the common law provided a single remedy, a recompense in damages.") (citation omitted).

## I. BSC IS NOT ENTITLED TO AN INJUNCTION PROHIBITING COOK FROM CONTINUING THE ONGOING ACHIEVE CLINICAL TRIAL AND USING THE RESULTING DATA

BSC's request for an injunction risks irreparably damaging the ultimate usefulness of a nationwide medical research study currently being conducted for the ACHIEVE stent. Over 1,000 patients are currently taking part in a FDA-regulated clinical trial involving the ACHIEVE stent ("the ACHIEVE clinical trial"), which is currently in the patient follow-up phase. Half of these patients have been implanted with the ACHIEVE stent. Sixty-one participating hospitals are currently working on this clinical trial, which includes collecting patient data, disseminating it among the participants, warning participants of any problems, and ensuring that every patient receives proper medical attention and follow-up. (Ex. 1, Sheridan Decl. ¶ 14.)[3]

### A. There Is A Strong Public Interest In Allowing Clinical Trials To Continue And The Resulting Data To Be Used

This case involves weighing interests of the health and well-being of members of the public who are not parties to this action. More than 700,000 people die each year from diseases of the heart. One of the principal therapies for treating coronary artery disease is percutaneous transluminal coronary angioplasty ("PTCA"), either with or without a stent implant. The subject of this case is a new type of stent product (called a drug-eluting stent) that delivers a therapeutic drug to the coronary artery at the point of treatment. It is hoped that drug-eluting stents will eliminate or significantly reduce the occurrence of restenosis after PTCA treatment. (Ex. 2, Rogers Decl. ¶ 15.)

There are currently three drug-eluting stents in U.S. clinical trials. (Id. at ¶¶ 16, 23.) The purpose of these clinical trials is to demonstrate that these devices are safe and effective so that they can be provided to the public. (Ex. 1, Sheridan Decl. ¶ 8.) The medical community

---

[3] To date, over 700 patients have been enrolled in a second clinical trial involving the ACHIEVE stent, which is designed to study patients with the highest risk of restenosis.

anxiously awaits the results of these trials and potential FDA approval of one or more products. (Ex. 2, Rogers Decl. ¶¶ 18, 20, 22.)  For the following reasons, the public interest weighs heavily in favor of allowing this life-saving medical research to go forward and ultimately be used:

- The ACHIEVE stent is a promising drug-eluting stent that offers significant performance advantages over the other drug-eluting stents currently in clinical trials. (Ex. 2, Rogers Decl. ¶¶ 30, 35, 37.)  Because no one knows which of these products, if any, will be successful in the long run, it would be a serious mistake to enjoin one of the promising efforts in development at this time.  (Id. at ¶ 35.)

- The continuation of the clinical trials would greatly benefit the public and would cause no harm, interference or damage to BSC.  (Ex. 1, Sheridan Decl. ¶ 21.)  An injunction will delay, if not prevent altogether, the availability to patients of the ACHIEVE stent.  If Cook is enjoined now and nevertheless prevails on appeal, many patients will be denied the significant benefit of the ACHIEVE stent because of the delay.

- The patients enrolled in the ACHIEVE clinical trial have voluntarily taken on personal risk to advance medical science.  (Ex. 1, Sheridan Decl. ¶ 18; Ex. 2, Rogers Decl. ¶ 38; Ex. 3, McCullough Aff. ¶ 33.)   It would be unfair to these volunteer patients to squander the data being gathered at their risk.  (Ex. 1, Sheridan Decl. ¶ 18; Ex. 2, Rogers Decl. ¶ 38; Ex. 4, Weitzman Decl. ¶ 16.)

- Contrary to BSC's suggestions, the three drug-eluting stents in development are significantly different.  (Ex. 2, Rogers Decl. ¶ 26.)  For example, BSC and Johnson & Johnson ("J&J") have designed their drug-eluting stents by mixing the drug with various polymers and applying the drug-polymer mixture to their stents.  (Id. at ¶ 32.) Some polymers have caused adverse effects in prior clinical work.  (Id. ¶ 33; Ex. 3, McCullough Aff. ¶¶ 11-13.)  The ACHIEVE stent, in contrast, does not use a drug-polymer mixture.  (Ex. 2, Rogers Decl. ¶ 32.)  The long-term effects of delivering a drug via a drug-polymer mixture are unknown and continue to be studied.  (Id. at ¶¶ 32-33.)

-4-

**B.**    **Federal Law Protects The Collection And Use Of Clinical Data For Medical Devices Even Where Constitutionally-Based Claims Of Exclusivity Are Asserted**

BSC incorrectly argues that Pfizer, Inc. v. International Rectifier Corp., 217 U.S.P.Q. 157 (C.D. Cal. 1982), mandates that this Court enjoin the collection and use of the data from the ACHIEVE clinical trial. Although the court in Pfizer did enjoin the use of clinical data for the purpose of obtaining FDA approval of an infringing product, the case was superseded by a federal statute, 35 U.S.C. § 271(e)(1), enacted in 1984. See 35 U.S.C. § 271(e)(1) ("It shall not be an act of infringement to make, use, offer to sell, or sell . . . a patented invention . . . solely for uses reasonably related to the development and submission of information under a Federal law which regulates the manufacture, use, or sale of drugs . . . .").[4]

With Section 271(e)(1), Congress recognized an important public interest in encouraging early testing and approval of medical devices even where a party asserts a Constitutionally-based right of patent exclusivity. Indeed, cases after Pfizer recognize that injunctions of the very type proposed by BSC (i.e., barring use of clinical data collected in support of an application for FDA approval of a medical device) are improper. See, e.g., Eli Lilly & Co. v. Medtronic, Inc., 915 F.2d 670, 674 (Fed. Cir. 1990) (superseded in part by statute on an unrelated issue) ("In the case of a permanent injunction, that necessary predicate is a judgment of infringement, which as previously stated, requires consideration of, and an adverse ruling on, the section 271(e)(1) issue in this case."); 35 U.S.C. § 271(e)(3) ("In any action for patent infringement brought under this section, no injunctive or other relief may be granted which would prohibit the making, using, offering to sell, or selling within the United States or importing into the United States of a patented invention under paragraph (1).") (emphasis added); cf. John Hopkins Univ. v. CellPro, Inc., 152 F.3d 1342, 1366 (Fed. Cir. 1998) ("[J]udicial restraint of lawful noninfringing activities

---

[4]  See also Eli Lilly & Co. v. Medtronic, Inc., 496 U.S. 661, 669-76 (1990) (Section 271(e)(1) also applies to the collection and use of clinical data for medical devices); Telectronics Pacing Sys., Inc. v. Ventritex, Inc., 982 F.2d 1520, 1525 (Fed. Cir. 1992) ("By permitting the testing and regulatory approval process to begin well before a controlling patent had run its course, Congress must have intended to allow competitors to be in a position to market their products as soon as it was legally possible."); AbTox, Inc. v. Exitron Corp., 122 F.3d 1019, 1030 (Fed. Cir. 1997) ("As long as the activity is reasonably related to obtaining FDA approval, Jacob's intent or alternative uses are irrelevant to its qualification to invoke the section 271(e)(1) shield."); Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc., No. 95 Civ. 8833, 2001 U.S. Dist. LEXIS 19361, at *26 (S.D.N.Y. Nov. 27, 2001) ("The case law holds that subsequent use of data developed for FDA approval does not violate Section 271(e)(1).").

must be avoided . . . ."). Although Section 271(c)(1) applies to patent infringement cases, the strong public policy embodied in that statute applies equally to the current dispute.

Here, the data from the ACHIEVE clinical trial is being acquired exclusively as a result of non-infringing activity. This activity could never have infringed Angiotech's or anyone else's patents in the first place. In short, neither Cook nor ACS needs to exercise any license rights to collect this data or use it to obtain FDA approval for the ACHIEVE stent. Because the data for the ACHIEVE clinical trial is being collected under the protection of 35 U.S.C. § 271(e)(1) (and therefore cannot constitute infringement of any patent), the Court should not enjoin future collection and use of the data. Federal public policy strongly discourages use of contracts to stretch patents beyond their permissible bounds. See, e.g., Scheiber v. Dolby Labs. Inc., 293 F.3d 1014, 1017 (7th Cir. 2002).

## C. Barring Cook From Using The Clinical Data Would Punish Cook And Award BSC A Windfall

The purpose of contract remedies is to the put the parties in the position they would have been but for the breach. See, e.g., Northwest Television Club, Inc. v. Gross Seattle, Inc., 634 P.2d 837, 842 (Wash. 1981) (en banc) ("[T]he decree should place the parties, as far as possible, in the condition in which they would have been if the contract had been duly performed at the time the conveyance should have been made."). However, the non-breaching party should not reap a windfall. See Rathke v. Roberts, 207 P.2d 716, 721 (Wash. 1949) ("[Plaintiff's] recovery is limited to the loss he has actually suffered by reason of the breach; he is not entitled to be placed in a better position than he would have been in if the contract had not been broken."); 3 E. Allen Farnsworth, Farnsworth on Contracts § 12.8 (2d ed. 1998) ("[I]t is a fundamental tenet of the law of contract remedies that an injured party should not be put in a better position than had the contract been performed.") Enjoining the use of the clinical data would put Cook in a worse position than it would have been but for the breach while impermissibly awarding BSC a windfall. Even without ACS, the clinical trial of the ACHIEVE stent would still be in the same position as it is today, well ahead of BSC's paclitaxel-eluting stent efforts. (Ex. 3, McCullough Aff. ¶ 24.) Cook has the resources for such work and has obtained FDA approval for a number of stent products over the last ten years. (Id.)

BSC's request to enjoin data used "in connection with" the ACHIEVE stent is too broad because it ignores the fact that Cook has always been ahead of BSC in developing a drug-eluting

stent and, therefore, is punitive. Before Cook even entered into the Guidant Agreements, it (1) had spent nearly $100 million on developing paclitaxel-eluting stent technology, (2) was well on its way to obtaining FDA approval for a paclitaxel-eluting stent, (3) had developed its own proprietary technology for applying paclitaxel to stents, (4) had conducted detailed studies to determine effective drug dosing levels, and (5) conducted both animal and human studies with paclitaxel-eluting stents. (Ex. 3, McCullough Aff. ¶¶ 8-10, 13-16, 19-20.) In fact, it is undisputed that Cook was the first company to obtain FDA approval to conduct a clinical study for a paclitaxel-eluting stent (Cook's LOGIC PTX stent) in the U.S. (Id. at ¶ 15.) In short, Cook has always been ahead of BSC in this area. Enjoining Cook's clinical work on the ACHIEVE stent, and use of the resulting data to commercialize the ACHIEVE stent, unfairly punishes Cook. See, e.g., Agronic, 585 P.2d at 824 ("The purpose of an injunction is not to punish a wrongdoer for past actions but to protect a party from present or future wrongful acts."). The evidence does not support any claim of "unfair advantage" gained through the Guidant Agreements.

### D. Enjoining The Collection And Use Of The Clinical Data Will Harm Cook Substantially More Than Denial Will Harm BSC

"A court should not issue an injunction when the harm it will do to a defendant is disproportionate to the damage caused a plaintiff by the action he asks be enjoined." Id.. Here, the balance of harms clearly favors Cook, especially since Cook will take an appeal.

An injunction prohibiting the collection and use of the clinical data for the ACHIEVE stent will permanently and irreparably harm Cook. Cook would inevitably lose all developmental and testing progress on the ACHIEVE stent. If the clinical trials now underway were stopped, they could not be resumed at a later date because the data and information would be unusable. (Ex. 1, Sheridan Decl. ¶¶ 17,19; Ex. 3, McCullough Aff. ¶¶ 35, 37.) Additionally, if the Court enjoins Cook from using the clinical data, the FDA and hospitals may refuse to allow the data to be re-created. (Ex. 1, Sheridan Decl. ¶ 20; Ex. 3, McCullough Aff. ¶ 35; Ex. 4, Weitzman Decl. ¶ 15.) Clinical trials for medical devices such as the ACHIEVE stent are carefully reviewed by the hospitals that participate in the trial. (Ex. 4, Weitzman Decl. ¶¶ 5-10.) The hospitals designate "Institutional Review Boards" ("IRB") comprised of experienced physicians and members of the local community to ensure that proposed clinical trials are safe and ethical. (Id. at ¶¶ 7, 9.) If the Court enjoins the use of the resulting clinical data, Cook may

-7-

not be able to replicate the trial because the hospitals and the FDA may raise ethical concerns with such a study. (Id. at ¶ 15 (noting ethical concerns with repeating clinical trial and randomizing the "control arm" patients to a placebo known to be less effective than the device being studied); Ex. 1, Sheridan Decl. ¶ 20; Ex. 3, McCullough Aff. ¶ 35.) Accordingly, Cook might never be able to recover from the harm caused by an injunction. In contrast, the continuation of the clinical trials and the collection and use of clinical data by Cook has caused no harm and would cause no harm to BSC that cannot be adequately compensated.

## II. BSC IS NOT ENTITLED TO AN INJUNCTION PROHIBITING FUTURE BUSINESS RELATIONSHIPS WITH ACS

BSC requests an injunction that "[n]either Cook nor its affiliates shall, directly or indirectly, sell or transfer paclitaxel-eluting stents to ACS or its affiliates, or distribute paclitaxel-eluting stents through ACS, its affiliates, or any other third-party." (BSC's Proposed Order at ¶ 2.) This injunction seeks to prohibit in advance all possible business relationships between Cook and ACS that would result in sales or transfers of paclitaxel-eluting stents to ACS, or distribution of such stents by ACS. Washington law does not support BSC's injunction request. "Injunctions must be tailored to remedy the specific harms shown rather than to enjoin all possible breaches of the law." Kitsap County v. Kev, Inc., 720 P.2d 818, 823 (Wash. 1986) (en banc); see also Whatcom County v. Kane, 640 P.2d 1075, 1077 (Wash. Ct. App. 1981) ("The trial court must be careful not to issue a more comprehensive injunction than is necessary to remedy proven abuses, and if appropriate the court should consider less drastic remedies.").

In reaching its summary judgment decision, the only business relationship before this Court was the one defined by the Guidant Agreements. There are other business relationships available to Cook and ACS (such as the acquisition recently announced on July 30 between Guidant, ACS's parent company, and Cook Group, Inc., Cook's parent company) that fall within the express terms of the Angiotech Agreement, but which are not before the Court in this case.[5] Indeed, BSC and this Court have recognized that the Guidant Agreements would be proper if the arrangement were between affiliates. (See BSC Sum. Judg. Br. at 4; BSC Sum. Judg. Reply Br. at 1-8, 12 and 19; June 26, 2002 Mem. Op. at 15.) The propriety or legality of any other

---

[5] On July 30, 2002, Guidant and Cook Group, Inc. announced that they have entered into a Merger Agreement that is expected to close in early 2003. This transaction is the subject of a declaratory judgment action recently filed with this Court.

business arrangements involving the Angiotech Agreement would necessarily need to be analyzed in light of the facts and circumstances surrounding that deal. BSC's injunction would be tantamount to finding all such future relationships impermissible without scrutiny, i.e., in violation of due process. See Lewis Pac. Dairymen's Ass'n v. Turner, 314 P.2d 625, 634 (Wash. 1957) (holding that injunction decree was overbroad because it did not protect the plaintiff from existing or threatened acts by the defendant but rather imposed an "unwarranted restraint" on the defendant for his past misconduct); see also Kitsap County, 720 P.2d at 823 (modifying permanent injunction that enjoined operation of any business, even lawful ones).

## III. BSC IS NOT ENTITLED TO AN INJUNCTION PROHIBITING PERFORMANCE UNDER THE GUIDANT AGREEMENTS

BSC also seeks an injunction providing that "[n]o person or entity shall render any performance under or attempt to enforce the ACS Deal." BSC's request should be denied because Cook will be irreparably harmed by such an injunction and BSC completely fails to identify any irreparable harm it will suffer if the injunction is not granted. The balance of harms clearly favors Cook.[6] Moreover, BSC has failed to prove that it has suffered or will suffer damages, or that it will have no adequate legal remedy, if an injunction is not entered.

### A. Cook Will Be Irreparably Harmed If An Injunction Is Issued Now

Cook has spent considerable sums to bring an effective paclitaxel-eluting stent to market, including development of proprietary technology for applying paclitaxel to stents and conducting animal studies, dosing studies, and human clinical studies. (Ex. 3, McCullough Aff. ¶¶ 6-16.) Only recently, in recognition of the potentially superior capabilities of the ACS Penta stent and rapid exchange stent delivery system, Cook entered into the Guidant Agreements. (Id. at ¶¶ 17-

---

[6] Indeed, BSC's failure to ever seek a temporary restraining order or a preliminary injunction belies any claims of immediate irreparable harm. The injunction BSC seeks would be punitive in nature because it would invalidate clinical trials that have been proceeding without any attempt by BSC to enjoin them. See, e.g., Programmed Tax Sys., Inc. v. Raytheon Co., 419 F. Supp. 1251, 1255 (S.D.N.Y. 1976) (denying injunctive relief because where plaintiff requested permanent injunctive relief in its complaint, but waited ten weeks after the action was filed to move for preliminary injunctive relief, "[s]uch a delay evidences a lack of irreparable injury and constitutes a separate ground on which the extraordinary relief now requested by plaintiff should be denied.").

18.) In sum, Cook enjoys a considerable technical and commercial advantage over BSC due to its own developmental and business efforts.[7]

Cook's loss would be permanent and irreparable in two ways. First, Cook would lose all developmental and testing progress on the ACHIEVE stent that could not be reactivated at a later date. Second, Cook would lose profits on all lost sales and would have no remedy for the harm it will suffer as a result of the injunction.[8]  See Cedar-Al Prods., Inc. v. Chamberlain, 748 P.2d 235, 236 (Wash. Ct. App. 1987) ("[N]o damages may be awarded for wrongfully obtaining an injunction if a bond does not exist."); Ty, Inc. v. Publications Int'l Ltd., 292 F.3d 512, 516 (7th Cir. 2002) ("The main reason for allowing the interlocutory appeal of an injunction, moreover, is that an injunction is likely to inflict irreparable harm on the defendant, that is, harm that a reversal will not cure.").

### B.    BSC Is Not Being Damaged

BSC's entire argument about the inadequacy of damages rests on the faulty premise that whatever speculative damages it may incur in the future must be calculated now. BSC nowhere mentions and, in fact, seems to concede that it has no damages now. Instead, BSC argues that it is impossible to calculate now the damages it may sustain in the future from any commercial sales of the ACHIEVE stent. However, at this point in time, it is entirely speculative as to whether BSC will suffer any damages. BSC is not presently being damaged by sales of the ACHIEVE stent. Any sales that have been made have only been made in the context of conducting the clinical trials for the ACHIEVE stent. There have been no commercial sales of ACHIEVE stent in the U.S. Indeed, none will take place until the ACHIEVE clinical trial is completed, the data is analyzed, and the FDA approves the ACHIEVE stent for commercial sale. The earliest date at which this might occur is sometime in the latter half of 2003 – likely after the

---

[7]  In addition, an injunction would irreparably harm Angiotech (the licensor to Cook and BSC of the Angiotech technology) and the NIH (the licensor to Angiotech of certain of the Angiotech technology) by depriving them of both the benefits of ongoing research and royalties for which they would have no remedies whatsoever.

[8]  BSC only begs the question by arguing that Cook can suffer no legally cognizable harm because of its own illegal conduct in entering the Guidant Agreements. The question of "legality" has not been finally decided. Until it is, however, the specter of severe irreparable harm to Cook mandates there be no injunction.

appeal of this case is decided.[9]  The fact that such potential future damages cannot be calculated now, does not mean that BSC will not have an adequate damages remedy and that an injunction is justified.  It merely means that BSC's damages claim is not ripe.

Moreover, there are many events that must occur before BSC will suffer any damage.  Indeed, a fundamental error that permeates BSC's entire brief is that BSC's argument for injunctive relief is premised on speculative assertions that may never occur.  BSC's assumption that its paclitaxel-eluting stent will perform well in clinical testing and will be approved for sale is speculative at best.  The eventual approval and success of Cook's ACHIEVE stent is also unknown.  If the ACHIEVE stent cannot outperform its competitors, it will not take away any sales from BSC or anyone else.  Clinical trial results that initially look promising can sometimes sour.[10]  Given the uncertainty of the results of the clinical trials, BSC's claim that it will be damaged by the ACHIEVE stent sometime in the future is speculation at this time.  As such, it is an inappropriate reason for granting injunctive relief.  See, e.g., Tyler Pipe, 638 P.2d at 1219 ("An injunction is an extraordinary equitable remedy designed to prevent serious harm.  Its purpose is not to protect a plaintiff from mere inconveniences or speculative and insubstantial injury.") (emphasis added); Bell Fuels, Inc. v. Butkovich, 559 N.E.2d 164, 166 (Ill. App. Ct. 1990) ("[E]quitable relief will not be granted where only a speculative possibility of injury is advanced and where injury is contingent upon uncertainties.") (emphasis added).

BSC's further speculation that its reputation, including its ability to enter long-term contracts with customers, will be irreparably injured if the ACHIEVE stent reaches the market first mischaracterizes the nature of the marketplace.  (Ex. 3, McCullough Aff. ¶¶ 3-4); see also Salsbury Labs., Inc. v. Merieux Labs., Inc., 735 F. Supp. 1537, 1543-44 (M.D. Ga. 1987)

---

[9]  Although it is expected that the ACHIEVE stent will be sold in Europe during the appeal of this case, any sales are expected to be much smaller than in the U.S.  (Ex. 3, McCullough Aff. ¶ 25 (5:1 ratio).)  Nonetheless, as with any potential U.S. sales of ACHIEVE stents, BSC's economic damages resulting from any European sales of ACHIEVE stents can be readily calculated and awarded if necessary.

[10]  Soon after BSC acquired Quanam Corporation in 2001, further development of the acquired drug-eluting stent (using a paclitaxel derivative) was abandoned as a result of poor clinical results.  (Ex. 9, BSC press release, Apr. 20, 2001; Ex. 3, McCullough Aff. ¶ 27; Ex. 2, Rogers Decl. ¶ 24.)  Two other similar examples include ACS's recent ACTION clinical trial and J&J's currently ongoing SIRIUS clinical trial.  ACS's ACTION trial tested a drug-eluting stent that used the drug actinomycin-D.  (Ex. 2, Rogers Decl. ¶ 24.)  The product did not turn out to be effective.  (Id.)  In J&J's SIRIUS trial, J&J has not been able to duplicate the extraordinary results that it obtained in an earlier and much smaller trial conducted in Europe.  (Id.)

(denying a preliminary injunction in trade secret misappropriation because lost sales could be compensated with monetary damages and loss of goodwill and reputation are too speculative to constitute irreparable harm). There is no "first to market" advantage in the PTCA market because physicians are sophisticated customers and are quick to adopt superior products. (Ex. 3, McCullough Aff. ¶¶ 3-5; Ex. 2, Rogers Decl. ¶ 29.) If BSC's product is superior, physicians will certainly choose it over the ACHIEVE stent. (Ex. 3, McCullough Aff. ¶¶ 3-5.)

BSC also erroneously claims that if the ACHIEVE stent performs less effectively than BSC's product, the reputation of BSC's paclitaxel-eluting stents could be harmed. This argument does not reflect the reality of the market. If one product does not perform as well as another, the market will quickly turn to a superior product.

Finally, BSC claims in a footnote that it may be suffering damage at this moment because "[Cook] and ACS will put [the ACHIEVE stent] in the regulatory queue in front of BSC [and thus] may extend BSC's regulatory path." (BSC Br. at 9 n.8.) This claim is also mere speculation, and there is no reliable evidence supporting BSC's claim. Moreover, the FDA strives hard to ensure that all applications are treated equally so that device approval timelines are kept consistent. (Ex. 1, Sheridan Decl. ¶ 21.) BSC's review and approval time will be determined on the basis of when its application is submitted and is complete. Again, there is no injury.

## C. If The ACHIEVE Stent Is Commercially Sold In The Future, BSC Has An Adequate Legal Remedy And Will Not Be Irreparably Harmed

If the ACHIEVE stent is commercially sold under the Guidant Agreements in the U.S. or Europe during the appeal of this case, and BSC prevails on appeal, BSC's damages can then be determined. Monetary damages will provide BSC with an adequate remedy at law. This is the normal remedy for breach of contract. See, e.g., Decker, 39 P. at 263.[11] Although it is true that damages to BSC cannot be calculated right now, any damage to BSC resulting from commercial

---

[11] BSC's reliance on section 11.1 of the Angiotech Agreement to argue that the agreement contemplates that "certain breaches of the agreement would cause irreparable injury" is erroneous. The agreement provides that in cases where there "is no adequate remedy at law" a party "may" suffer irreparable injury. This does not change the well-established law that a party seeking an injunction must still prove irreparable injury.

-12-

sales of the ACHIEVE stent can readily be calculated at the end of the appellate process. All of the "unknown" factors BSC now complains of will be known. The market size, market share, pricing, BSC's costs, and Cook's profits will be known or easily determined. BSC can be adequately compensated in damages at that time. (Ex. 10, Rapp Decl. ¶ 20 (such damages determinations routinely made).) Finally, even if BSC can establish that it will suffer damages to its reputation, they can be calculated and compensated for with money. (Id. at ¶¶ 26-33.)

Where a movant's harm flows from lost sales, courts typically refuse to enter injunctions because money damages are adequate. See, e.g., Petereit v. S.B. Thomas, Inc., 63 F.3d 1169, 1186 (2d Cir. 1995) (vacating permanent injunction for breach of distributorship agreement because lost profits, the usual breach of contract remedy, were "readily determinable"); DSC Communications Corp. v. Next Level Communications, 107 F.3d 322, 328 (5th Cir. 1997) (affirming denial of permanent injunction against disclosure of trade secrets where damages awarded were based on lost sales because claim was premised on defendant's development of a competing product, thus precluding "the drastic solution of a permanent injunction"); Salsbury Labs., 735 F. Supp. at 1543-44.

As aptly stated by the Supreme Court regarding whether to issue an injunction,

[t]he key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.

Sampson v. Murray, 415 U.S. 61, 90 (1974) (emphasis added). In this case, there is no need for injunctive relief. E.g., Doe v. Bridgeport Police Dep't, 198 F.R.D. 325, 335 (D. Conn. 2001) ("The possibility that adequate compensatory . . . relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.").

Injunctions are particularly inappropriate when the harm to the public interest outweighs the harm to the movant, a situation that arises in cases involving medical devices or drugs. For example, in Roche Prods., Inc. v. Bolar Pharm. Co., 733 F.2d 858, 865-66 (Fed. Cir. 1984), although the Federal Circuit found the competing drug infringing, on remand for consideration of the proper remedy (a finding subsequently superseded by 35 U.S.C. § 271(e)(1)), it strongly discouraged the entry of the proposed injunction because the injunction would require the destruction of data "that may embody information that would contribute to the health and happiness of the human race." See also Datascope Corp. v. Kontron Inc., 786 F.2d 398, 401

(Fed. Cir. 1986) (affirming denial of preliminary injunction in part because physicians preferred the defendant's catheter).

BSC's heavy reliance on <u>Walgreen Co. v. Sara Creek Property Co.</u>, 966 F.2d 273 (7th Cir. 1992), is misplaced. In that case, Walgreen (a shopping mall tenant) sued a mall landlord for breach of contract because the landlord sought to allow another pharmacy to lease space in the mall in violation of Walgreen's lease. <u>Walgreen</u>, 966 F.2d at 274. The appellate court affirmed the trial court's decision to enter a permanent injunction enforcing the terms of Walgreen's lease. The situation here is dramatically different. First, the public policy issues involved in this case were absent in <u>Walgreen</u>. Indeed, there the court held that "[t]here is no contention that the injunction will harm an <u>unrepresented</u> third party." <u>Id.</u> at 278 (emphasis in original). Here, there are significant public policy concerns for "unrepresented third parties" including members of the medical community, over 1,000 patients currently implanted with the ACHIEVE stent, future patients who might receive the potentially life-saving ACHIEVE stent, and medical science in general. (Ex. 2, Rogers Decl. ¶¶ 37-39; Ex. 4, Weitzman Decl. ¶¶ 14-16.) Second, as opposed to the current dispute, there was no condition precedent in <u>Walgreen</u> that needed to be satisfied before any damage occurred. BSC's damages claim, in contrast, is speculative at this time. In addition, in <u>Walgreen</u> it was assumed that the landlord's agreement with the competing pharmacy would allow the competing pharmacy to continue to compete throughout the term of Walgreen's lease. In contrast, if Cook does not prevail on appeal, it will cease selling products under the Guidant Agreements. At that time, damages, if necessary, could be readily calculated. Thus, there is no need for injunctive relief.

## CONCLUSION

If Cook is not successful in its appeal, Cook will not continue to sell the ACHIEVE stent to ACS under the Guidant Agreements. Therefore, in this respect, there is only a difference between Cook's and BSC's position during the pendency of the appeal. With respect to BSC's request to enjoin the use of the clinical data, an injunction should not be granted that would apply during the pendency of the appeal, or thereafter, even if Cook is not successful on appeal. Under Section 271(e)(1) neither Cook nor ACS needs any license rights from Angiotech to conduct the ACHIEVE clinical trial, generate the clinical data, or seek FDA approval for the ACHIEVE stent. In addition, there is a strong public policy disfavoring the grant of an injunction against

the use of clinical trial data. Finally, BSC clearly has an adequate remedy at law for any damages it may suffer, while Cook has no remedy. The balance of harms strongly favors Cook.

For all of the foregoing reasons, Cook respectfully requests that BSC's motion for injunctive relief be denied.

Respectfully submitted,

Dated: August 14, 2002

Ronald Wilder
Frederick J. Sperling
John A. Bannon

SCHIFF HARDIN & WAITE
6600 Sears Tower
Chicago, Illinois 60606
312/258-5500

Attorneys for Plaintiff Cook Incorporated

-15-

# *See Case File for Exhibits*