JS-6

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Charles P. Kocoras | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 01 C 9479 | DATE | 10/1/2002 |
| CASE TITLE | Cook Incorporated vs. Boston Scientific Corp. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due _____. Reply to answer brief due _____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] **ENTER MEMORANDUM OPINION:** Boston Scientific Corporation's motion (Doc 80-1) for permanent injunctive relief is granted. All matters in controversy having been completed, final judgment is entered accordingly.

(11) ■ [For further detail see order attached to the original minute order.]

| | |
|---|---|
| | No notices required, advised in open court. |
| | No notices required. |
| | Notices mailed by judge's staff. |
| | Notified counsel by telephone. |
| ✓ | Docketing to mail notices. |
| ✓ | Mail AO 450 form. |
| | Copy to judge/magistrate judge. |

SCT    courtroom deputy's initials

date docketed: OCT 0 1 2002

Document Number: 92

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED
OCT 1 2002

COOK INCORPORATED,               )
                                 )
                Plaintiff,       )
                                 )
        vs.                      )   01 C 9479
                                 )
BOSTON SCIENTIFIC CORPORATION,   )
                                 )
                Defendant.       )

## MEMORANDUM OPINION

CHARLES P. KOCORAS, Chief District Judge:

This matter is before the court on a motion for permanent injunctive relief brought by Defendant Boston Scientific Corporation. For the reasons stated below, we grant the motion.

## BACKGROUND

On June 26, 2002, we granted Boston Scientific Corporation's cross-motion for summary judgement. This case involves a co-exclusive license agreement dealing with paclitaxel-coated stents that are used to treat heart disease and avoid restenosis. The agreement is between Angiotech Pharmaceuticals, Inc. ("Angiotech"), Boston Scientific Corporation ("BSC"), and Cook Incorporated ("Cook"). We found in our June 26 opinion that the agreement limited the commercial use of paclitaxel-coated

92

stents to Cook and BSC. Thus we held that another series of agreements between Cook and Advanced Cardiovascular Systems ("ACS"), which allowed ACS to distribute paclitaxel-coated stents and aid Cook in getting FDA approval, violated the co-exclusive agreement. Since that ruling Cook and ACS have continued to prepare their version of paclitaxel-coated stents named ACHIEVE in violation of the Angiotech agreement and are approaching the point at which ACHIEVE may be sold commercially in the U.S. and elsewhere in the world. ACHIEVE is a few months closer to regulatory approval in the U.S. than BSC's paclitaxel-coated stents named TAXUS. Johnson & Johnson is also expected to have a drug-coated stent on the market named CYPHER approximately six months before ACHIEVE is marketed. There are currently over 1,000 patients taking part in a FDA-regulated clinical trial involving ACHIEVE which is in the patient follow-up phase.

BSC brought this motion for permanent injunctive relief because it believes that it will suffer substantial harm and have no adequate legal remedy if Cook is allowed to introduce ACHIEVE into the market before BSC introduces TAXUS. BSC claims that Cook was able to accelerate the development and preparation of ACHIEVE through the assistance of ACS in violation of the Angiotech agreement. According to BSC, ACHIEVE will occupy a portion of the market that TAXUS would otherwise occupy. Also, ACS has a much broader range of products to sell than Cook. Thus,

ACS and Cook will be able to "bundle" other related products, such as guide wires and guide catheters, with a sale of stents and they will also take away a portion of the market of other products that BSC would normally "bundle" with its stent sales. BSC also claims that ACS provides Cook with a far superior distribution system and will further unnaturally increase Cook's market share. According to BSC, when ACHIEVE is sold to physicians, contracts as long as 24 months will be signed, thus potentially foreclosing portions of the drug-coated stent market for years. Also, according to BSC once ACHIEVE is on the market, physicians are not as likely to change to a similar new product such as TAXUS unless there is a good reason such as a significant difference in price or effectiveness.

## LEGAL STANDARD

Cook claims that Washington law rather than federal law governs the issuance of a permanent injunction because a federal court will apply state substantive law in diversity cases. *See Capital Tool and Mfg. Co., Inc. v. Maschinenfabrik Herkules*, 837 F.2d 171, 172 (4th Cir. 1998) (indicating that under *Erie* state law governed decision of whether to grant final injunction); *Hanger Prosthetics & Orthotics, Inc. v. Morgan*, 2000 WL 1843820, *1 (S.D. Ala. 2000) (stating that "[i]n a diversity case, whether to grant a permanent injunction is governed by state law."). BSC responds that this issue

- 3 -

is not relevant because under either the federal standard or the Washington standard an injunction is warranted.

Under federal law in deciding whether to grant a permanent injunction the court should consider: (1) whether the party seeking the injunction has succeeded on the merits; "(2) whether the [party seeking the injunction] will have an adequate remedy at law or will be irreparably harmed if the injunction does not issue; (3) whether the threatened injury to the [party seeking the injunction] outweighs the threatened harm the injunction may inflict on the [other party]; and (4) whether the granting of the injunction will harm the public interest ." *Plummer v. American Institute of Certified Public Accountants*, 97 F.3d 220, 229 (7th Cir. 1996); *See also Lovers Lane & Co. v. Village of Libertyville*, 128 F. Supp. 2d 1126, 1128 (N.D. Ill. 2000). Thus to obtain a permanent injunction the party seeking the injunction must show that it has no adequate legal remedy, but is not independently required to show an irreparable harm if the injunction is not granted. *See Crane by Crane v. Indiana High School Athletic Ass'n.*, 975 F.2d 1315, 1326 (7th Cir. 1992) (stating that unlike with a preliminary injunction, irreparable harm is not an independent element, but is only "one basis for showing the inadequacy of the legal remedy"); *see also Walgreen Co. v. Sara Creek Property Co.*, 966 F.2d 273, 275 (7th Cir. 1992) (stating that when a permanent

injunction is considered, the question is whether damages would be inadequate, not whether there would be irreparable harm).

Under Washington state law a party seeking an injunction must show: "(1) that he has a clear legal or equitable right, (2) that he has a well-grounded fear of immediate invasion of that right, and (3) that the acts complained of either are resulting in or will result in actual and substantial injury to him," and (4) there is not a "plain, complete, speedy and adequate remedy at law." *Kucera v. Dept. of Trans.*, 995 F.2d 63, 68 (Wash. 2000). In deciding whether to grant an injunction the court must also balance the hardships on the parties and consider the interests of the public. *Id.* at 68.

We note that Cook has incorrectly cited *Kucera*, claiming that it stands for the proposition that the party seeking an injunction must show "that it has no adequate legal remedy <u>and</u> that it would be irreparably injured absent an injunction," emphasizing the "and" in the statement. Cook seems to base its argument on this rule when it argues that BSC has not shown it would suffer an irreparable injury. Cook misstates the rule in *Kucera*. The four factor standard listed above for granting an injunction is taken from *Kucera*. *Id.* Nowhere in *Kucera* does the court state that a party must show an inadequate legal remedy and irreparable harm. Having an inadequate legal remedy and facing irreparable harm are not necessarily mutually exclusive. In fact, in *Kucera* the court discusses possible irreparable harm to the

environment in a section entitled "Inadequate Legal Remedy" and indicates that irreparable harm relates to when the legal remedy would be inadequate due to the fact that the injury "by its nature cannot be compensated by money damages." *Id.* at 69. We note also that the court includes as one instance when legal remedies would be inadequate when "the damages cannot be ascertained with any degree of certainty." *Id.*

## DISCUSSION

I. Damages Based on Speculation

BSC argues that damages would be inadequate because any calculation would be too speculative. According to BSC, the size of the overall drug-coated stent market will have to be determined, but it is uncertain at what rate the stents will supplant older technologies and how many will be eventually sold. Also it will be impossible to predict the decline rate as newer technologies supplant the stents. It is not even known when the new technology will arrive at the market place. BSC also claims that it would be impossible to determine its market share with and without the ACS deal. At the moment no one has any market share as none of the products are on the market yet. To determine market shares, the Court will have to speculate as to when ACHIEVE and other competitors enter the market place and the success of their products. Also in addition to determining Cook's market share, the court will need to determine what

impact ACS's superior sales force had on BSC's market share. Finally, the court will need to multiply the number of sales lost by the profits on each sale. However, the cost per stent is unknown as BSC has not yet brought them into full production and production costs will fluctuate over time. Additional guessing would need to be done regarding the amount of sales other than stents that BSC will lose as a result of ACS's ability to offer a wide range of other related products along with the stents. What makes all of the above determinations even more difficult is that we are dealing with a new product with no history of revenues or costs on which to base predictions. BSC also argues that its goodwill and reputation will be harmed which is difficult to quantify in damages.

We agree that in attempting any calculation of damages for BSC that we would be pulling numbers out of the air and basing our finding on pure conjecture. Not only would we need to determine the amount of the market share that will be lost to Cook we will need to determine what other products' sales were lost by BSC as a result of ACS's bundling other products with ACHIEVE. Additionally we would be making those predictions concerning products that have not even been approved by the FDA yet and have no market history.

Cook responds that BSC is suffering no damages now and the earliest that ACHIEVE might enter the market is in the latter half of 2003. According to Cook the

court will be speculating if it grants an injunction because it is uncertain whether BSC will suffer any damages. Also Cook argues that it cannot be assumed that BSC's product will perform well in the marketplace. Neither can it be assumed that ACHIEVE will be successful and thereby take business away from BSC. Cook's argument misses the point for under such an approach there would be no certainty that BSC would suffer damages until BSC actually began suffering damages. The nature of an injunction is that a court can take a proactive preemptive step, particularly where damages will not provide an appropriate remedy later, to try and prevent a harm before it occurs. It is not a prerequisite that the party seeking the injunction already be in the process of suffering damages. Cook admits that it is doing everything in its power to get ACHIEVE approved and into the marketplace for commercial gain. We find that to be sufficient to characterize the harm to BSC as likely and imminent.

Cook also argues that the unknown variables associated with calculating BSC's damages will be known by the time the appeal is completed. At that time, if Cook is unsuccessful on appeal, the stents will be in the marketplace and the damages can be readily determined. This argument ignores the fact that on August 7, 2002, we denied Cook's motion for a stay. Cook concedes that there are no hard numbers currently available that would help solidify a damages determination. We therefore find that

BSC does not have an adequate remedy at law due to the difficulty in determining the amount of damages.

II. Harm to the Parties

Cook claims that if an injunction is issued, it will suffer extreme hardship and Cook will never recover. According to Cook, once testing is stopped the data collected would be worthless. Also, hospitals may have ethical concerns with repeating the clinical trial and randomizing the control arm patients to a placebo known to be less effective than the device being studied. BSC disputes this claim, stating that if Cook's stent is superior, any new coated stent could be tested against an established coated stent or against published data. Cook also claims that it will be harmed because the injunction will nullify Cook's own work in developing the stent before the ACS agreement. Cook claims that had it developed ACHIEVE solely on its own, ACHIEVE still would be closer to release into the market than the stent of BSC. Cook claims that prior to the ACS agreement it spent nearly $100 million developing paclitaxel-eluting stent technology, was well on its way to getting FDA approval on its own, and had conducted extensive studies and developed its own technology. In making this argument, Cook also brings up the contract law principle that a remedy for a breach of contract is supposed to put the parties back in their original position prior to the contract and not award a windfall to either party. By nullifying Cook's past efforts on

its own to develop the stent, the court is destroying a competitor of BSC and is therefore putting BSC in a better position than it was before the contract. Cook also states that it will be harmed because it is seeking an appeal and will be harmed by the injunction if there is a reversal. As stated above, we denied Cook's motion for a stay and are not obligated to sit on our hands while Cook proceeds through the appeal process.

BSC acknowledges that the injunction will constitute a setback in Cook's development of a paclitaxel-coated stent. However, BSC vehemently denies that Cook would have beaten it to market without the unlawful aid of ACS. BSC also claims that Cook's loss as a result of the injunction is the direct result of Cook's own wrongdoing. Cook's only response is that it will yet be determined on appeal if Cook is in the wrong and so it is premature to punish them in a manner that could cause them irreparable harm. We made a final ruling in this case when we granted BSC's motion for summary judgment and we denied Cook's request for a stay. We have already determined that Cook is in the wrong and are not obligated to wait until Cook exhausts all its appeals before we make any further decisions in this case. We think that ACS did accelerate the development of ACHIEVE ahead of BSC. If Cook devoted so much time and effort into development prior to the ACS deal, then its harm from the injunction should be minimal as it claims that it was well on its way to FDA approval on its own.

Although it is regrettable that Cook's research efforts may be nullified and the trial data will be rendered useless, Cook has unilaterally put itself into this position. Cook cannot complain when BSC seeks to do nothing more than uphold its rights under the Angiotech contract. By involving the ACS deal in its development of a stent in violation of the Angiotech agreement, Cook tainted its trial data. We cannot go back in time and set Cook on its way prior to the ACS deal and thus allow Cook to avoid wasted efforts. Cook has chosen its own path in this affair and now it must live by its decision. Also, it is important to note that BSC is not seeking to foreclose Cook from ever again developing paclitaxel-coated stents. Cook will be allowed to restart its independent development program which it halted in March 2002. BSC has spent more than 150 million dollars in the last five years developing a paclitaxel-coated stent delivery system and the system is its most important product currently in development. In equity a court must strive to be fair and do justice. In this case we have Cook claiming that it will be harmed because it will be denied the fruits of its own wrong doing. On the other hand we have BSC, whose most promising product in development will be substantially disadvantaged by Cook's beating it to the market. Justice clearly falls in BSC's favor.

III. Public Interest

An additional factor raised by Cook is the public interest. Where an injunction would prohibit a certain type of medical treatment, as in this case, we take an extremely cautious look at the public interest. Cook states that over 1,000 patients are currently taking part in a FDA-regulated clinical trial involving ACHIEVE. Cook claims that if it is not allowed to continue those trials, the test patients' sacrifice in the interests of medical science would be wasted. We note that Cook does not argue that the current test patients' medical care would be compromised in any way under the proposed injunction. Cook claims that the public needs ACHIEVE because it is a valuable tool for the treatment of heart disease and ACHIEVE is far superior to the other stents that are on the verge of FDA approval. Specifically Cook claims that ACHIEVE is superior to the other stents coming out because it does not use a drug polymer-mixture.

BSC counters, stating that the injunction specifically allows physicians to continue to use the data and technology to provide medical care for those 1,000 patients. BSC also claims that volunteers in trial programs know that the drug they are testing may not be marketed commercially. In addition, BSC points out that there are other technologies that can be used to treat restenosis which is a chronic condition that is rarely life threatening. We agree that Cook overstates the public interest in an attempt to draw the sympathy of the court and overlook the fact that Cook's ultimate

goal is to market ACHIEVE commercially. We are satisfied that the current test subjects will continue to get necessary medical care and that other technologies are available.

We point out that there will be other drug-coated stents available soon. Johnson & Johnson is forecasted to come out with the stent CYPHER six months before ACHIEVE and TAXUS is only three months behind ACHIEVE in the regulatory process. Cook has not provided any conclusive evidence that current test patients for ACHIEVE or other current heart disease patients will face any additional health risks as a result of the proposed injunction.

We also note that the public interest is served by enforcing contracts. *See Caterpillar, Inc. v. Jerryco Footwear*, 880 F. Supp. 578, 593 (C.D. Ill. 1994) (stating that "[t]he public has an interest in seeing that parties that enter into commercial agreements honor those agreements...."); *Uarco, Inc. v. Eastland*, 584 F. Supp. 1259, 1262 (D.C. Kan. 1984) (referring to policy favoring enforcement of valid contracts when deciding to enforce non-competition clauses). We must also strive to ensure that the public has confidence in our willingness to enforce contractual obligations. We fail to provide such confidence if we permit Cook to ignore its contract with BSC in order to advance its own interests and then escape the consequences by proclaiming that it is doing the people's work.

IV. Whether Injunctive Relief Standards Warrant Issuance

We believe that both the federal and the Washington standards for injunctive relief provide the same result. BSC has a legal right that has been infringed upon and will continue to be infringed upon, and BSC has a well-grounded fear that its rights will be violated. It is not contested that at this very moment Cook is doing everything in its power to obtain FDA approval and to proceed to commercialization of ACHIEVE and that ACHIEVE is forecasted to be released months prior to TAXUS. If Cook beats BSC to the market, the injury to BSC will be real. Although the amount of harm will be unclear, by beating BSC to the market a certain share of the market will be occupied before BSC enters the market. It will be difficult for BSC to take back the market from ACHIEVE once ACHIEVE is established. Physicians normally sign contracts that can be as long as 24 months.

Physicians may not be motivated to change from ACHIEVE to a similar product like TAXUS unless there is some dramatic difference in price or effectiveness. Also, as stated above, any determination of damages that should be awarded to BSC is not feasible as it would have to be based on pure conjecture. In addition to the many unknown variables concerning stent market shares, there would be injuries to BSC's goodwill and reputation which would also be difficult to quantify. Although irreparable harm is not an independent element of either the federal or Washington

standard, BSC would be irreparably harmed because the sales and contracts that Cook obtains could not be undone. Even if damages were to be calculated in the future after the stents had a market history, it would still be virtually impossible to determine what BSC's market shares in the stents and other related products would have been in the natural course of events in the marketplace absent ACHIEVE.

Finally, we do not find any compelling public interest that stands against issuance of an injunction. Other products similar to ACHIEVE will be on the market relatively soon. In fact CYPHER should be on the market earlier than ACHIEVE's forecasted approval. Also, the 1,000 test patients in the Cook FDA trials will still be allowed to get appropriate treatment. Although Cook will suffer some setbacks as a result of this injunction, its harm stems solely from its own wrongdoing. Cook's harm is also less than the considerable harm which BSC would face if an injunction were not issued. Cook is now free to restart its independent development program which it suspended. Therefore, under both the federal standard and the Washington standard, we find that an injunction is warranted.

V. Scope of Injunction

Cook argues that the proposed injunction is too broad because it would foreclose all future relationships between ACS and Cook. The proposed order states: "2. neither Cook nor its affiliates shall directly or indirectly sell or transfer paclitaxel-eluting stents

to ACS or its affiliates, or distribute paclitaxel-eluting stents through ACS, its affiliates, or any other third party." Cook points out that this court indicated in its summary judgment opinion that the ACS agreements would be proper if they were between Cook and an affiliate. Thus if ACS or another company were to eventually become an affiliate of Cook, an agreement might be allowable. Cook claims that the proposed order would foreclose all future relationships between Cook and ACS without scrutiny in violation of due process.

BSC asserts that Cook is planning to circumvent this court's summary judgment ruling. Immediately after this court granted BSC's motion for summary judgement, ACS issued a press release indicating that it would be restructuring its relationship with Cook so as to allow ACS to distribute the stents. BSC points out that in our opinion we stated that the Angiotech agreement "clearly evinces an intent that only Cook and [BSC] are to be players in the paclitaxel business." BSC urges this court make sure that Cook and ACS are not able to avoid the true intent behind our ruling by making a cosmetic relationship change.

We find that the language in number 2 of the proposed injunctive order is too broad. Cook is correct in asserting that it would be unfair to foreclose any possible involvement in paclitaxel-coated stents by ACS or other parties. BSC claims that the essence of our summary judgement opinion in this case is that ACS is to have no

further involvement with the Angiotech agreement subject matter. This case is based on a contract and we based our findings specifically upon the terms of the Angiotech agreement. Therefore, the injunction shall only restrict activities that would violate the Angiotech agreement. If Cook and ACS or any other party can restructure their relationship in a manner that does not violate the Angiotech agreement, then it will not be a "scam" as BSC asserts. We note however, that any attempt at restructuring will not only have to comply with the explicit terms of the Angiotech agreement, but will also have to comply with applicable contract principles and our summary judgment opinion. It appears that BSC included number 2 in the proposed order in an attempt to head off future attempts by ACS or other parties to alter their position in order to comply with the Angiotech agreement. We will deal with any such issues on an individual basis as cases arise.

VI. Section 271(e)(1)

Cook claims that neither Cook nor ACS needs to exercise any licensing rights to collect clinical trial data or to use it for FDA approval. Cook claims that it is authorized to use the data under 35 U.S.C. § 271(e)(1) which states that: "it shall not be an act of infringement to make, use, offer to sell, or sell . . . a patented invention . . . solely for uses reasonably related to the development and submission of information under a Federal law which regulates the manufacture, use, or sale of drugs . . . ." BSC

is correct to point out that § 271(e) is not applicable in this case because this case does not involve a patent infringement, and we are not convinced by Cook's assertion that the public policy behind § 271(e) applies equally to this case.

## CONCLUSION

For the foregoing reasons we grant BSC's motion for a permanent injunction and hereby order that:

1) No person or entity shall render any performance under or attempt to enforce the ACS deal, which consists of agreements dated August 16, 2001 between Cook, Inc. and Advanced Cardiovascular Systems, Inc., and

2) Neither Cook, Inc. nor its affiliates shall directly or indirectly sell or transfer paclitaxel-coated stents to another party, or distribute paclitaxel-coated stents through another party in a manner inconsistent with the Angiotech agreement dated July 9, 1997, and

3) No information, data or technology generated or gathered in connection with the ACS deal shall be used for any commercial purpose, including the purpose of obtaining regulatory approval to sell paclitaxel-coated stents in the United States or elsewhere. Notwithstanding the foregoing, physicians may use such information, data or technoloy to provide medical care that they deem

reasonable to patients who, as of the date of this order, were enrolled in clinical studies conducted in connection with the ACS deal, and

4) The court shall retain jurisdiction over any dispute regarding compliance with this order or Cook's compliance with the Angiotech agreement.

_____
Charles P. Kocoras
Chief Judge
United States District Court

Dated: October 1, 2002

-19-